FILED'06 MAR 31 11:10USDC-ORP



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

COLLETTE A. BOYD,                                    CV. 04-814-PK
                    Plaintiff,

v.                                                   OPINION AND
                                                     ORDER OF REMAND

JOANNE B. BARNHART,
Commissioner of Social Security,
                    Defendant.

_____

PAPAK, Magistrate Judge:

## INTRODUCTION

Plaintiff Collette Boyd brings this action pursuant to the Social Security Act, 42 U.S.C. §

405(g) ("the Act"), to obtain judicial review of a final decision of the Commissioner of the Social

Security Administration ("Commissioner") denying her claim for Supplemental Security Income

("SSI") benefits.  For the reasons set forth below, the decision of the Commissioner is remanded

for further administrative proceedings consistent with this opinion.

## PROCEDURAL BACKGROUND

Boyd filed an application for SSI benefits on February 16, 2001, alleging disability since

December 31, 1996, due to fibromyalgia, juvenile myoclonic epilepsy, a seizure disorder, headaches, pain in her back, neck shoulder and foot, carpal tunnel syndrome, and depression. The application was denied initially and upon reconsideration. On March 25, 2003, a hearing was held before an Administrative Law Judge ("ALJ"). In a decision dated June 3, 2003, the ALJ found Boyd not disabled and therefore not entitled to benefits. On April 30, 2004, the Appeals Council denied Boyd's request for review, making the ALJ's decision the final decision of the Commissioner. Boyd now seeks judicial review of the Commissioner's decision.

## STANDARDS

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The

Page 2 - OPINION AND ORDER OF REMAND

Commissioner's decision must be upheld, however, if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999):

Step One. The Commissioner determines whether claimant is engaged in substantial gainful activity. If so, claimant is not disabled. If claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate claimant's case under step two. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Step Two. The Commissioner determines whether claimant has one or more severe impairments. If not, the claimant is not disabled. If claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under step three. 20 C.F.R. §§ 404.1520(c), 416.920(c).

Step Three. The Commissioner next determines whether claimant's impairment "meets or equals" one of the impairments listed in the Social Security Administration ("SSA") regulations found at 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, claimant is disabled. If claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of claimant's case proceeds under step four. 20 C.F.R. §§ 404.1520(d), 416.920(d).

Step Four. The Commissioner determines whether claimant is able to perform work he or she has done in the past. If so, claimant is not disabled. If claimant demonstrates he or she

Page 3 - OPINION AND ORDER OF REMAND

cannot do work performed in the past, the Commissioner's evaluation of claimant's case proceeds under step five. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Step Five. The Commissioner determines whether claimant is able to do any other work. If not, claimant is disabled. If the Commissioner finds claimant is able to do other work, the Commissioner must show a significant number of jobs exist in the national economy that claimant can do. The Commissioner may satisfy this burden through the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines found at 20 C.F.R. Part 404, Subpart P, Appendix 2. If the Commissioner demonstrates a significant number of jobs exist in the national economy that claimant can do, claimant is not disabled. If the Commissioner does not meet this burden, claimant is disabled. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

At steps one through four, the burden of proof is on the claimant. Tackett, 180 F.3d at 1098. At step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. Id.

THE ALJ'S DECISION

At step one, the ALJ found Boyd had not engaged in substantial gainful activity since the alleged onset of her disability on December 31, 1996. This finding is not in dispute.

At step two, the ALJ found Boyd had the medically determinable severe impairments of fibromyalgia, pain disorder, seizure disorder, a non-specific cognitive disorder, and dysthymic disorder. This finding is in dispute in that Boyd argues that she has additional severe impairments than those found by the ALJ at step 2.

At step three, the ALJ found that Boyd's impairments did not meet or medically equal the

Page 4 - OPINION AND ORDER OF REMAND

criteria of any listed impairments. This finding is in dispute in that Boyd argues that her severe impairments do meet or equal a listing.

At step four, the ALJ found that Boyd was not fully credible and retained the residual functional capacity (RFC) to perform a limited range of light exertion work, precluding even moderate exposure to hazards including machinery and heights. The ALJ determined that Boyd was able to perform her past relevant work as a bartender and cashier/checker. This finding is in dispute in that Boyd argues that she is unable to sustain full-time employment at any job.

At step five, the ALJ made no finding, contrary to what the Commissioner asserts in her brief. See Tr. 24[1] ("Because Ms. Boyd has not met the burden of proving she is unable to perform her past relevant work, a finding at the fifth step in the sequential evaluation is not appropriate").

## DISCUSSION

Boyd was 40 years old at the time of the ALJ's decision. She completed high school and attended some business college classes which she did not complete. Her past employment was as a bartender, cashier, and grocery stocker. The medical records accurately set forth Boyd's medical history as it relates to her claim. A review of those records in some detail is essential to this court's conclusion that remand is appropriate.

Medical Background

Boyd experienced a head injury at age 15 and began treatment shortly thereafter for grand mal and petit mal seizures. Tr. 376. She was initially treated with Dilantin but experienced side

---

[1]Citations are to the page(s) indicated in the official transcript of the record filed with the Commissioner's Answer.

effects including chronic depression. Tr. 376-77. She was diagnosed with generalized epilepsy in 1983 and treated with Clonopin or clonazepam which was effective in decreasing her seizures. Tr. 376. She came under the care of Dr. Brewster Smith, a neurologist, in 1984. He diagnosed her with juvenile myoclonic epilepsy. Tr. 376-77. Over the years, Dr. Smith treated Boyd's epilepsy primarily with Depakote which controlled her grand mal seizures adequately, but did not fully control her petit mal seizures which continued to occur 3-4 times per week. Tr. 351. On August 29, 2001, Boyd's Depakote dosage was 1000mg twice each day. Tr. 416. Boyd experiences post-seizure/postictal exhaustion, memory loss, soreness and disorientation. Tr. 134. Boyd does not have a driver's license or drive a car due to her seizures

Boyd was diagnosed with carpal tunnel syndrome after an on-the-job injury to her right hand and wrist and had surgery for that condition in 1988 or 1989. Tr. 91, 96, 177, 211. Nerve conduction velocity studies were normal as of May, 1990. Tr. 178. An orthopedist found some residual finger hypesthesia in July 1999 secondary to her carpal tunnel surgery. Tr. 179.

Boyd was injured on February 2, 1991, at work. Tr. 176. She was physically straightening some hooks when she experienced a popping sensation in her left shoulder and left scapular area. Tr. 176. She saw a number of doctors after this event. One doctor diagnosed bursitis on March 15, 1991, took her off work for seven days, and treated her with Indocin. Tr. 177. X-rays on April 12, 1991, were within normal limits. Tr. 177. Boyd had a course of physical therapy that included treatment two or three times per week for six weeks and then continued physical therapy in an aquatic program and other therapies for some months (April 1991 - November 1992). Tr. 205, 212, 223-239. She was taken off work for several days between March and June 1991. Tr. 190-203.

Page 6 - OPINION AND ORDER OF REMAND

She was examined as part of a worker's compensation claim by two doctors in an orthopedics practice on July 22, 1991. Tr. 176. She complained of pain in the tip of her left shoulder and pain in the left scapular area, both of which would worsen with movement, and pain in her left trapezius (neck and shoulder) which was aggravated by neck motion and gave rise to headaches. Tr. 178. The diagnosis was left shoulder strain, left rotator cuff tendinitis, and cervical strain and they recommended an injection of the left shoulder. Tr. 180. The doctors found her very nearly medically stationary with regard to this injury. Tr. 180. Dr. John DiPaola, an orthopedist, evaluated Boyd on September 17, 1991, based on complaints of continuing numbness and pain. Tr. 205. He diagnosed chronic left shoulder girdle pain and scapulothoracic strain. Tr. 206. In a letter about Boyd to Dr. Smith dated September 17, 1991, Dr. DiPaola stated that he thought Boyd might have fibromyalgia and that he did not identify any orthopedic problem. Tr. 384.

Boyd was examined by Dr. Smith on November 7, 1991, for her ongoing complaints of pain in her left shoulder, upper back and neck, and headaches.[2] Tr. 366, 410-12. He stated his belief that Boyd was most likely suffering from a chronic scapular humoral and paracervical myofascial pain syndrome triggered by her on-the-job injury of February 2, 1991. Tr. 367. He explained that some individuals will go on to develop a chronic musculoskeletal pain in the region of a seemingly minor muscular ligamentous injury. Tr. 367. He also included depression and adjustment disorder in his assessment. Tr. 410.

---

[2]Boyd was examined and evaluated by Dr. Smith for her shoulder and back pain and migraines on June 27, 1991 (Tr. 404-05), July 16, 1991, September 5, 1991 (Tr. 408-09) and examined by a member of his staff on August 14, 1991. His conclusions on those dates were consistent with the ones stated above on other examination dates.

Boyd was examined by Dr. Smith on December 18, 1991, for left shoulder, arm and neck pain and migraines which were exacerbated by her job activities. Tr. 359. He concluded that while there were no objective medical findings to prevent Boyd from performing her light duty job, she did experience significant subjective symptomatology, i.e. pain, related to the performance of her current job. Tr. 360. He mentioned a recent MRI scan of the cervical spine on November 8, 1991, was negative. Tr. 360. He also concluded that Boyd was probably medically stationary. Tr. 360. Dr. Smith gave Boyd work releases for myofascial shoulder pain, rotator cuff discomfort and migraine headaches on days between November 1991 and February 1992. Tr. 356-58, 386, 397.

Boyd was re-examined on January 13, 1992, by the same orthopedics office (different doctor) that saw her in July of 1991 as she felt no better with regard to her shoulder injury. Tr. 210. Dr. McKillop found no significant objective findings to support pain complaints and diagnosed residual symptoms based on her previous injury and mild rotator cuff tendinitis. Tr. 214-15. He found her medically stationary and capable of full-time work. Tr. 216.

Boyd was referred by her employer to a medical arbiter examination on July 17, 1992, with two orthopedists and one neurologist. Tr. 218. They found status post cervical and left shoulder strains, no evidence to suggest a chronic and permanent medical condition due to the previous injury, and found that she could work in the light/medium category. Tr. 220.

On January 22, 1992, Dr. Smith treated Boyd for her shoulder pain, diagnosed myofascial pain syndrome and noted that Boyd was having an increasing number of migraines. Tr. 240-242. His physical exam notes include that Boyd experienced pain on rotation of her left shoulder. Tr. 242. He treated her with Trazadone, Midrin, Clinoril and Depakote. Tr. 240. He treated her

Page 8 - OPINION AND ORDER OF REMAND

again on January 28, 1992 and noted some improvement in her pain levels, migraines, and depression. Tr. 243. He completed a physical exam that showed mild tenderness in the same areas on Boyd's left side, and noted that her epilepsy was controlled. Tr. 243-44. On July 28, 1992,[3] Dr. Smith's assessment indicates that Boyd has chronic left shoulder pain, that her current treatment is palliative, that her migraines seem to stem from increased neck and shoulder pain, and that she is medically stationary. Tr. 398. Dr. Smith also treated Boyd on October 20, 1992, and diagnosed left parascapular and cervical myofascial pain as stable and that her epilepsy remained well controlled. Tr. 401.

Boyd has ongoing depression issues. Boyd states that she stopped working in 1996 due to a high-risk pregnancy. Tr. 89. The baby was stillborn at seven months on May 27, 1997. Tr. 145. In December 1997, Dr. Smith treated her for depression with the anti-depressant Paxil but she experienced unpleasant side effects. Tr. 353. His chart notes on December 22, 1997, state that Boyd could not tolerate a range of anti-depressants and that she did not wish to try any new psychoactive medications. Tr. 353. He assessed her as having adjustment reaction with reactive depression at that visit. Tr. 354. He also treated her during that visit for her occasional myoclonic seizures. Tr. 353-54.

On February 8, 1999,[4] Dr. Smith treated Boyd and noted that she was having headaches daily, that her petit mal seizures recurred in early December, that she had trigger point tenderness, and that she had sprained her left thumb which continued to cause her pain. Tr. 426-27. He assessed worsening epilepsy, myofascial pain, mixed headache disorder, and adjustment

---

[3]The chart notes for this date also indicate that Boyd was seen by Dr. Smith on April 28, 1992.

[4]Boyd was also treated by her obstetrician, Dr. Alfred Ono, in 1997. Tr. 290.

Page 9 - OPINION AND ORDER OF REMAND

disorder with anxiety. Id.

On May 4, 1999, Dr. Smith treated Boyd and noted her ongoing pain, that the pain increased when she is fatigued, and her desire to have a "pain free day." Tr. 424. He also noted swelling and pain in her fingers and wrists, and periodic pain in her elbows. Id.

On August 4, 1999, Dr. Smith treated Boyd and noted that she was having headaches, seizures in the mornings 2-3 days per week, continued pain in her lower back and neck, pain in her right arm and knees, disrupted sleep and ongoing stress and exhaustion. Tr. 422-23. He treated her for epilepsy, Chronic Fybromyalgia Syndrome, and chronic adjustment problems with anxiety and depression. Id.

Boyd had problems with her left ankle and foot and was diagnosed with posterior tibial dysfunction and very tight gastrocnemius (heel cords) in September 2000 by Dr. Thomas Palmer, a podiatrist. Tr. 92, 296. His chart notes mention uncertainty as to whether Boyd's insurance would cover an orthotic and the assessment that if no treatment was rendered, there was a high chance of complete collapse of the ankle and foot resulting in osteoarthritis. Tr. 296. Prior to that, Boyd was treated by Dr. Curtis Marr in March and August 2000 for persistent tendinitis in her left ankle. Tr. 262.

On May 22, 2000,[5] Dr. Smith wrote in a letter to Adult and Family Services that Boyd had recurring migraines, chronic intractable myofascial pain disorder, and that she continued to struggle with chronic neck, shoulder and upper back pain. Tr. 352. He also wrote that Boyd was limited in her physical capabilities in terms of lifting, pushing and pulling. Tr. 352. He opined

---

[5]Dr. Smith also examined Boyd on September 7, 2000, with consistent analysis of symptoms (Tr. 418-19), and on June 5, 2000  with the addition of tendinitis in the left foot and bilateral carpal tunnel syndrome (Tr. 420-21).

Page 10 - OPINION AND ORDER OF REMAND

that Boyd was totally disabled and unable to sustain work activity due to her multiple physical problems. Tr. 352.

On October 10, 2000, Dr. Smith was asked to clarify statements he made to the state office of Disability Determination Services (DDS). Tr. 382. Specifically, he was asked to clarify the following statement: "limited in her physical capabilities in terms of lifting, pushing, pulling, etc. Even prolonged sitting doing clerical work tends to aggravate her neck and upper back pain . . . totally disabled and unable to sustain work activity." Id. In response, Dr. Smith was asked to fill out a questionnaire as to how much Boyd could lift, how long she could walk/stand, and how long she could sit in an 8 hour day. Id. Dr. Smith responded that Boyd could occasionally lift 20 pounds and frequently lift 10 pounds, that she could walk/stand for 4 hours per day, and that she could sit for 8 hours per day. Id. He was also asked and responded that these restrictions were based on patient complaints as opposed to objective findings. Id. The restrictions Dr. Smith gave for Boyd were consistent with a range of light work. He also explained in the next section of the form that Boyd had chronic fibromyalgia and that repeated or heavy physical activity tends to aggravate her chronic neck and upper back pain. Id. He indicated that these symptoms first began over 10 years ago and that he expected them to continue indefinitely. Id.

In July, 2001, Boyd was examined by Dr. Sharon Labs, a neuropsychologist, to assess Boyd's level of cognitive and affective functioning for vocational purposes. Tr. 313-324. Dr. Labs concluded that Boyd demonstrated cognitive disorder not otherwise specified with a history of multiple head injuries and ongoing seizure disorder, a pain disorder associated with psychological factors and chronic medical conditions, and a dysthymic disorder. Tr. 323. Dr.

Page 11 - OPINION AND ORDER OF REMAND

Labs found that Boyd's history of seizures, migraine headaches and fibromyalgia significantly interfere with her ability to attend work, perform at a consistent pace without periods of significant rest, and found her not employable at that time. Id. Dr. Labs assigned Boyd a global assessment of functioning (GAF) score of 45.[6] Id.

On August 29, 2001, Dr. Smith examined Boyd and noted that she was free of grand mal seizures, still experiencing petit mal seizures three to four times per week, and that she was tolerating Depakote well. Tr. 416. He also noted that she continued to have fibromyalgia pain which fluctuated in severity, periodic migraines, chronic arthritis in her left ankle, and that she fatigued easily. Tr. 416. In a letter dated August 29, 2001, Dr. Smith noted that Boyd was disabled by chronic fibromyalgia causing back and limb pain and fatigue. Tr. 351.

Dr. Smith treated Boyd with the following medications: Depakote (seizures), Percodan (back pain and fibromyalgia), Flexeril (muscle spasms in her back), Sulindac (inflammation and pain), and Midrin (migraines). Tr. 93A. Boyd claims that Depakote causes side effects including depression, hair loss, fatigue, weight loss, and grogginess, and that Flexeril caused side effects including grogginess and sluggishness. Tr. 93A, 113.

Boyd's lower back was injured in an assault on August 29, 2001, from which she continues to experience pain. Tr. 160.

Boyd may have had gaps in treatment due to changes in insurance plans and waiting time for referrals. Tr. 96. She claims to have been refused appointments on at least two occasions due to difficulties with her insurance company. Tr. 96.

Boyd claims her ability to function is impacted by stress, lifting, walking and weather

---

[6]A GAF of 45 indicates "[s]erious symptoms or any serious impairment in social, occupational, or school functioning." Diagnostic and Statistical Manual of Mental Disorders at 34.

Page 12 - OPINION AND ORDER OF REMAND

changes such that she will experience seizures and immense pain on certain days that cause her to be unable to function and be sick for several days. Tr. 109. Boyd claims to be in pain every day. Tr. 130.

Boyd has experienced fatigue after she has a seizure since the seizures began in 1978 and changes in her medication may add to the fatigue. Tr. 110. The fatigue she experiences causes a need to rest between events such as taking her son to school and then going to a doctor's appointment. Tr. 110. Boyd claims she can be up and active for three hours or less before she needs to rest. Tr. 110.

Boyd received counseling on numerous occasions at Mt. Hood Community Mental Health Center from December 1997 to April 1998 and February to May of 2002, and Cascadia Behavioral Healthcare from May to July of 2002. Tr. 472-80 (Cascadia); Tr. 431-46 (Mt. Hood). She suffered from depression, anxiety, grief issues having to do with deaths in her family including a stillborn child, and emotional issues as a result of being a victim of domestic violence.

Claimant's Arguments

Boyd contends that the ALJ erred by: (1) failing to properly develop the record; (2) rejecting the opinions of her treating and examining physicians; (3) failing to comprehend the nature of fibromyalgia; (4) doing his own research; and (5) posing an inadequate hypothetical to the vocational expert.

I.     Development of the record

Boyd contends that the ALJ did not fully and fairly develop the record in a number of ways. The court examines this argument in the context of the ALJ's evaluation of the evidence of

Boyd's residual functional capacity (RFC), a determination made after step 3 in the disability analysis. The burden of providing a complete record, i.e. evidence that is complete and detailed enough to enable the Commissioner to make a disability determination, is on the claimant. 20 C.F.R. §§ 404.704, 404.1512, 404.1513. However, the Commissioner shares the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991). The ALJ's duty to fully and fairly develop the record and to assure that the claimant's interests are considered exists even when a claimant is represented by counsel. Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996) (citing Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)). The ALJ's duty to develop the record is triggered "when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." Mayes v. Massanari, 262 F.3d 963, 968 (9th Cir. 2001) (citing Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001)).

Specifically, Boyd points to a so-called longstanding dispute between the ALJ and Boyd's attorney as to who should be responsible for ensuring that all of Boyd's medical records were properly before the court. Tr. 1489. The first hearing in this case was continued from December 17, 2002, to March 25, 2003, because Boyd's counsel explained that bloodwork was to be completed and an electroenchelogram or EEG were to be performed in the future, and also that medical records of past nerve conduction studies were not in the record as yet. Tr. 1483. When the hearing resumed, the medical records still had not been provided to the court because Boyd could not afford their cost. The ALJ asserts that it is the responsibility of Boyd's counsel to pay the costs of medical reports. Tr. 24; See also Tr. 43 (Social Security Contingent Fee Retainer Agreement). Boyd's counsel asserts that obtaining the medical reports is part of the Commissioner's and thus the ALJ's duty to develop the record and that the case should be

Page 14 - OPINION AND ORDER OF REMAND

remanded for completion of the record. The ALJ explained he was denying the request for additional records because he did not need any additional records to make a finding in the case. The records in question are a recent nerve conduction study and an EEG from 2002.

As the ALJ correctly points out, it was the responsibility of Boyd's counsel to make a timely request for the court to subpoena the medical records in question when it became obvious that Boyd could not obtain them on her own. See Tr. 48 (SSA Notice of Hearing to Boyd, "Your Right to Request a Subpoena"); see also 20 C.F.R. § 404.950(d). An EEG is necessary to meet a listing for epilepsy. The EEG was supposed to be performed the day after the first hearing, on December 18, 2002. Tr. 483. A recent nerve conduction study would be relevant to assessing Boyd's claim of carpal tunnel syndrome but no specific information about the alleged study and when it was performed are provided by Boyd, beyond an assurance to the ALJ that the study would be post-February 16, 2001. Tr. 484.

This court finds that once the ALJ was made aware that relevant medical evidence existed and was not before the court, it became part of his duty to obtain those records under the broad duty to fully and fairly develop the record. The ALJ's duty to develop the record was triggered when he was told by the medical expert that an EEG was necessary to evaluate Boyd's seizure claim and the EEG had been done but was not in the record due to Boyd's inability to pay for the cost of medical records. Mayes, 262 F.3d at 968 (ALJ's duty to develop the record further is triggered when the record is inadequate). To meet a listing for epilepsy, the record must include an EEG. Tr. 484 (testimony of the ME); see also 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 11.02-11.03 (describing impairments for seizure disorders). The EEG was necessary for a full and fair evaluation of Boyd's claim of epilepsy.

This court also finds that the ALJ committed error in only considering § 11.02[7] of the Listing of Impairments when evaluating Boyd's epilepsy. Boyd was diagnosed with juvenile myoclonic epilepsy in approximately 1980, with a follow-up diagnosis by Dr. Brewster Smith in 1984. Tr. 376-77. Though Boyd's grand mal seizures were controlled adequately by the medication Depakote, Boyd continued to experience myoclonic petit mal seizures as often as two to four days per week.[8] The medical expert at the hearing noted that the frequency of Boyd's seizures "certainly meets the listing" though a detailed description of the seizures and an EEG were not present in the record. Tr. 511. The ALJ examined § 11.02 which describes "major motor seizures (grand mal)" but failed to examine § 11.03 which describes "minor motor seizures (petit mal)." Tr. 17 (listing which sections the ALJ examined). The ALJ's opinion also states, "I find no treating or examining medical sources of record have reported findings similar in severity to those required for the epilepsy impairment, as described in Section 11.02 of the Listing of Impairments." Tr. 18. Boyd also describes postictal manifestations of her seizures that would go toward meeting a listing that the ALJ failed to consider. Tr. 134, 416 (Dr. Smith's chart notes describing postictal manifestations; 420, 422 (same). By failing to assess whether Boyd met a listing under § 11.03, the ALJ committed error.

Because the ALJ failed to fully and fairly develop the record and ensure that Boyd's interests were considered, this case is remanded for that purpose. To correct the errors, Boyd's current EEG must be included in the record and § 11.03 describing petit mal seizures must be

---

[7]20 C.F.R. pt. 404, subpt. P, app. 1, §§ 11.02-11.03 (describing impairments for seizure disorders).

[8]Under § 11.03, petit mal seizures occurring more than once weekly are part of the criteria to meet a listing.

Page 16 - OPINION AND ORDER OF REMAND

considered to determine whether Boyd meets a listing for epilepsy.

II.    Opinion of the Treating Physician

Boyd contends that the ALJ wrongfully rejected the opinion of a treating physician, Dr. Brewster Smith. The court examines this argument in the context of the ALJ's evaluation of the evidence of Boyd's residual functional capacity (RFC), a determination made after step 3 in the disability analysis. W. Brewster Smith, M.D., is a neurologist. He began treating Boyd in April 1984 for her seizure disorder. At that time he diagnosed juvenile myoclonic epilepsy[9] and chronic depression, possibly secondary to anti-convulsant toxicity. Tr. 377. Dr. Smith treated Boyd on an ongoing basis for the following medical issues: epilepsy,[10] neck and shoulder pain, chronic myofascial pain syndrome, fibromyalgia, recurring migraine headaches, back pain, depression, anxiety, foot pain/tendinitis, and ankle pain. The breadth and length of this treating relationship is significant.

Generally, a treating physician's opinion is afforded the greatest weight in disability cases because the treating physician is employed to cure and has the best opportunity to know and observe the patient as an individual. Ramirez v. Shalala, 8 F.3d 1449, 1453 (9th Cir. 1993). A treating physician's opinion is controlling when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent" with other evidence of record. 20 C.F.R. § 416.927(d)(2). The opinion of a treating physician deserves more weight than that of an examining physician, and a non-examining physician's opinion is given the least relative weight. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). The ALJ can reject the

---

[9]More specifically, Dr. Smith found: "Probable primary generalized corticoreticular epilepsy with history of early morning myoclonic seizures and generalized tonic-clonic seizures."

[10]Idiopathic Generalized Epilepsy and Juvenile Myoclonic Epilepsy.

Page 17 - OPINION AND ORDER OF REMAND

treating physician's opinion in favor of the conflicting opinion of another treating or examining physician if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).

Overall, the ALJ discounted a great deal of Dr. Smith's conclusions over the course of a sixteen-year treating relationship based on lack of objective medical findings. The ALJ noted Dr. Smith's opinions and rejected them, stating:

> In the present case, it is clear that Dr. Smith was basically restating Ms. Boyd's subjective allegations and he was not reporting any findings based on medically acceptable diagnostic techniques. For that reason, I am not bound to accept his conclusions about Ms. Boyd's "total disability," "inability to sustain" or "seek any type of employment," which are not supported by the objective medical findings or record. Tr. 20

> While I considered Dr. Smith's statements to the extent that they refer to a period when the claimant was treated for epilepsy, I also noticed he reported her condition has been under adequate control with Depakote. His additional notes about other problems such neck and upper back pain, and the limitations he attributed to that, are not supported by objective findings. Tr. 21.

The Commissioner argues that the ALJ gave specific and legitimate reasons for rejecting Dr. Smith's medical opinions. The court notes that Dr. Smith's statement that Boyd is "totally disabled" cannot be given controlling weight, even though offered by a treating physician. Social Security Ruling (SSR) 96-5p. Such statements are not medical opinions about specific functional limitations but administrative findings reserved to the Commissioner. Id.

The Commissioner points to the fact that Dr. Smith outlined functional limitations on October 10, 2000, consistent with a range of light work but opined that Boyd was totally disabled and unable to sustain work on May 22, 2000, and on August 29, 2001. These inconsistent statements as to Boyd's condition gave the ALJ reason to question Dr. Smith's opinion. The

Page 18 - OPINION AND ORDER OF REMAND

court notes that the ALJ may reasonably rely on the functional limitations set out by a treating physician. Thus it is logical that the ALJ would find contradictory statements from one doctor difficult to reconcile. Under the circumstances, it would have been appropriate for the ALJ to re-contact Dr. Smith for additional information. An ALJ should make a reasonable effort to re-contact a treating source for clarification when there is internal conflict within a medical opinion. Paul v. Barnhart, No. 1:04-CV-272, 2006 WL 456765 at *2 (E.D. Tex. 2006) (citing SSRs 96-2p and 96-5p).

The Commissioner also cites the gap in treatment of May 2000 through August 2001, during which time Boyd did not see Dr. Smith. However, Boyd did see other doctors during that time[11] and there is no evidence in the record that Boyd discontinued the Depakote prescribed by Dr. Smith for her epilepsy and the various medications Dr. Smith provided to help manage her pain. Both Boyd's epilepsy and myofascial pain syndrome were chronic impairments and may not have required assessment on a short-term basis. Dr. Smith remained one of her treating physicians and had been treating her for sixteen years as of 2000 and therefore a short gap in treatment does not suggest that Boyd's impairments were not disabling.

The Commissioner argues that instead of relying on Dr. Smith, Boyd's treating physician, the ALJ relied on Dr. Robert Irwin, an examining physician, and Dr. Charles Spray, a reviewing physician. Dr. Irwin examined Boyd on August 9, 2001 for 52 minutes. He noted that she was tender to palpation in a number of areas, and that she had 13 out of 18 classic fibromyalgia tender

---

[11]See Tr. 295-98 (Palmer), 262 (Marr) (describing Boyd's treatment by primary care physician Dr. Curtis Marr and consultation with podiatrist Thomas Palmer during that time).

Page 19 - OPINION AND ORDER OF REMAND

points.[12]  Tr. 21.  She had two out of five control points at her ankles that were positive and the

left ankle was tender with manipulation.  Tr. 21.  She had one positive on Waddell's signs but

neither the ALJ nor the Dr. Irwin noted any signs of malingering.  Dr. Irwin stated Boyd had a

history of epilepsy including seizures, mixed headache disorder, and a history of carpal tunnel

syndrome.  Tr. 21-22.  Nothing in Dr. Irwin's report contradicts Dr. Smith's findings as to Boyd's

ongoing health problems and her limitations based on her combined ailments.

        Dr. Spray's report, a residual functional capacity ("RFC") assessment ordered by

Disability Determination Services, is dated August 17, 2001.  He found, based on the record

available at the time of his assessment, that Boyd was able to occasionally lift and/or carry up to

20 pounds, and frequently 10 pounds.  Tr. 23.  She could sit, stand and walk for about six hours

in an eight-hour workday and that she had unlimited abilities to push and/or pull within the light

exertional level.  Tr. 23.  He also concluded that she must avoid even moderate exposure to

hazards as a seizure precaution.  Tr. 23.  Dr. Spray also found Boyd's statements only partially

credible and found that she "cares for herself and her children" and that she "shops, cooks,

cleans."  Tr. 349.  Thus the ALJ found that Boyd could work within a limited range of light

exertion without any manipulative, visual or communicative limitations and adopted Dr. Spray's

referred limitations as part of Boyd's physical RFC.  Tr. 23.

        Overall, the ALJ appears to impugn Boyd's credibility and, thus fail to credit her

subjective statements regarding her symptoms.  He then discredits Dr. Smith for reporting and

treating those same symptoms.  The ALJ explains that "[Boyd's] subjective allegations are not

---

        [12]In patients with widespread body pain, the diagnosis of fibromyalgia can be made by
identifying point tenderness areas and typically patients will have at least 11 of 18 classic tender points.
Tr. 21, n. 1.

Page 20 - OPINION AND ORDER OF REMAND

supported by objective evidence."[13] Tr. 19. However, "the ALJ may not discredit pain testimony merely because a claimant's reported degree of pain is unsupported by objective findings." Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989). The ALJ must give specific, convincing reasons for rejecting the claimant's subjective statements. Id. This court finds that the ALJ did not provide these required reasons.

In rejecting Dr. Smith's assessment of Boyd, the ALJ instead relied on the opinions of Dr. Irwin and Dr. Spray. However, neither Dr. Irwin nor Dr. Spray reported on any physical condition that specifically called into question Dr. Smith's diagnoses of fibromyalgia, seizure disorder, or myofascial pain disorder. And Dr. Debolt, the medical expert who testified at the hearing and whose testimony the ALJ cited in his decision, did not look at foot problems, carpal tunnel problems, mixed headache problems or fibromyalgia. Tr. 509. Because the ALJ failed to set forth legitimate, specific reasons for rejecting Dr. Smith's disability opinion based on substantial evidence in the record, the ALJ erred in discrediting Dr. Smith's opinion. However, because there are outstanding issues[14] to be resolved before a determination of disability in Boyd's case can be made, this court will not order an immediate award of benefits. See Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996). On remand, Dr. Smith should be re-contacted for clarification of his opinion on whether Boyd is able to perform light exertion work within a limited range.

---

[13]In particular, the ALJ's rejection of Boyd's subjective symptoms with respect to her claim of fibromyalgia and Dr. Smith's treatment of those symptoms was inappropriate in that the ALJ effectively required objective evidence for a disease that eludes such measurement. Benecke v. Barnhart, 379 F.3d 587, 594 (9th Cir. 2004) (citations omitted).

[14]In addition to re-contacting Dr. Smith, other outstanding issues include: consideration of Boyd's recent EEG, consideration of § 11.03 in analyzing Boyd's seizures, and making specific findings regarding Boyd's claim of fibromyalgia.

Page 21 - OPINION AND ORDER OF REMAND

III.    Opinion of the Examining Physician

Boyd contends that the ALJ wrongfully rejected the opinion of an examining physician,

Dr. Sharon Labs. The court examines this argument in the context of the ALJ's evaluation of the

evidence of Boyd's residual functional capacity, a determination made after step 3 in the

disability analysis. Dr. Sharon M. Labs, Ph. D., P.C., is a neuropsychologist who examined Boyd

on July 5, 2001 and July 26, 2001. The purpose of her evaluation was to assess Boyd's level of

cognitive and affective functioning for vocational purposes. She administered a number of

standardized tests, reviewed Boyd's medical records and interviewed Boyd.

Dr. Labs concluded that Boyd demonstrated cognitive disorder not otherwise specified

with a history of multiple head injuries and ongoing seizure disorder, a pain disorder associated

with psychological factors and chronic medical conditions, and a dysthymic disorder. Tr. 323.

She further opined that from cognitive and affective perspectives, Boyd is not disabled strictly

on the results of the evaluation she completed. Id. "However, her history of seizures, migraine

headaches and fibromyalgia significantly interfere with activities of daily living as well as her

ability to attend work and perform at a consistent pace without periods of significant rest. I

concur with Dr. Smith's opinion that she is not employable at this time." Id.

In supporting the ALJ's decision to reject any mental disability, defendant argues that

Boyd did not receive any pyschiatric or psychological treatment. This assertion is incorrect.

Boyd received counseling on numerous occasions at Mt. Hood Community Mental Health Center

from December 1997 to April 1998 and February to May of 2002, and Cascadia Behavioral

Healthcare from May to July of 2002. Tr. 472-80 (Cascadia); Tr. 431-46 (Mt. Hood). She was

treated for depression, stress, anxiety, and domestic violence issues.

Page 22 - OPINION AND ORDER OF REMAND

The ALJ rejected the physical and combined physical and mental findings made by Dr. Labs and focused instead on the psychological and clinical findings. The ALJ justified this decision by finding that Dr. Labs relied on Boyd's own descriptions of physical and psychological symptoms and history. However, Dr. Labs found "no evidence of purposeful distortion of cognitive functioning or evidence of frank malingering." Tr. 319. And as discussed above, the ALJ did not provide specific, convincing reasons for rejecting the claimant's subjective statements. See Fair, 885 F.2d at 602. Thus the ALJ lacked evidence to reject Dr. Labs' conclusions which were based on a combination of mental and physical evaluations of Boyd's condition. On remand, Dr. Labs' opinion should be credited and weighed appropriately along with other medical evidence in the record.

IV.    Fibromyalgia

Boyd argues that the ALJ failed to comprehend the nature of fibromyalgia and wrongly required objective medical evidence to confirm Boyd's fibromyalgia diagnosis. The Commissioner responds that the ALJ accepted the diagnosis of fibromyalgia but found it not that limiting. The court examines this argument in the context of the ALJ's evaluation of the evidence of Boyd's residual functional capacity (RFC), a determination made after step 3 in the disability analysis.

Fibromyalgia is a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue. Benecke v. Barnhart, 379 F.3d 587, 589 (9th Cir. 2004). Fibromyalgia's cause or causes are unknown, there is no cure, and its symptoms are entirely subjective. Rollins v. Massanari, 261 F.3d 853, 855 (9th Cir. 2001). There are no laboratory tests for the presence or severity of fibromyalgia. Id. The principal

Page 23 - OPINION AND ORDER OF REMAND

symptoms are pain, fatigue, disturbed sleep, stiffness and "the only symptom that discriminates between it and other diseases of a rheumatic character," multiple tender spots, more precisely 18 fixed locations on the body that when pressed firmly cause the patient to flinch. Id. The rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia. Id. "The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms." Benecke, 379 F.3d at 590.

For clarity, this court will summarize the medical evidence relating to fibromyalgia cited by the ALJ in his decision. In his decision, the ALJ noted that Dr. William DeBolt, the medical expert who testified at the hearing, found that she had 11 out of 18 positive trigger points classically found in cases of fibromyalgia as a result of an examination on August 17, 2001, and also a positive response to two out of five control points.[15] He also found that Boyd's diagnosis of fibromyalgia had not been confirmed by medically acceptable diagnostic techniques. However, in giving her the benefit of the doubt, he found that she had the severe physical impairment of fibromyalgia, completing Step 2 of the disability analysis which requires the ALJ to determine whether the claimant has one or more severe impairments. In reference to Dr. Irwin's examination of August 9, 2001, the ALJ noted Boyd had 13 out of 18 classic fibromyalgia tender points, two out of five positive control points at her ankles, and that Dr. Irwin had not excluded other medical conditions that can resemble fibromyalgia. The ALJ also had this to say about Dr. Smith's assessment of Boyd as "also disabled" by chronic fibromyalgia: "I find this is an unsupported statement that seems intended to advocate for Ms. Boyd's disability case, instead

---

[15]In fact, the examination in question was performed on August 9, 2001, and found 13 out of 18 positive trigger points and the positive control points were at Boyd's ankles; she alleges ongoing pain in one ankle. Tr. 329.

Page 24 - OPINION AND ORDER OF REMAND

of making an objective report based on confirmed findings on physical examination or appropriate tests." Tr. 22. Dr. DeBolt, the medical expert at Boyd's hearing, clarified for the ALJ that rheumatologists are in the best position to evaluate a fibromyalgia claim. Tr. 516. The ALJ found that none of Boyd's impairments, including her fibromyalgia, met a listing.

The ALJ erred in discounting Boyd's subjective pain testimony and the opinion of Dr. Smith, Boyd's treating physician, as to the diagnosis of fibromyalgia. As detailed above in the medical records discussion, Boyd had nearly all of the symptoms of fibromyalgia, including chronic pain, fatigue, and the positive trigger points. She also was taking medication prescribed by Dr. Smith to treat many of her pain symptoms. The ALJ erred by "effectively requir[ing] 'objective' evidence for a disease that eludes such measurement." Benecke, 379 F.3d at 594 (citing Green-Younger v. Barnhart, 335 F.3d 99, 108 (2nd Cir. 2003)). In addition to Dr. Smith, Dr. DiPaola, an orthopedist, had also opined that Boyd had fibromyalgia. The ALJ took no direct testimony from Boyd on her fibromyalgia claim during her hearing and then when drawing conclusions on her claims in his decision, the ALJ found that "her subjective allegations are not supported by objective evidence." Tr. 19. Thus, the ALJ erred in failing to credit Boyd's pain testimony, the medical files and the diagnosis and opinion of Dr. Smith as to Boyd's fibromyalgia.

This case is remanded with instructions to make specific findings regarding the severity of Boyd's fibromyalgia and to fully analyze the limits arising from Boyd's fibromyalgia during the relevant time period. Rheumatology is a relevant specialty for fibromyalgia. Benecke, 379 F.3d at 594 n.4 (citations omitted). Since a rheumatologist was not consulted previously, this court suggests that on remand a rheumatologist be designated to evaluate Boyd's claim as to the

Page 25 - OPINION AND ORDER OF REMAND

severity of her fibromyalgia.

      V.      ALJ Performed his own Research

      Boyd claims the ALJ impermissibly did his own research on fibromyalgia. Tr. 21. The ALJ's opinion includes a footnote to a website that describes how fibromyalgia is diagnosed. While this court notes that an ALJ's use of evidence not part of administrative record may be error, the research had to do with Boyd's fibromyalgia claim. And since this court remands for further consideration of that claim, the ALJ's reference to the diagnosis of fibromyalgia need not be addressed at this time.

      VI.     Adequacy of Vocational Expert Hypothetical

      Boyd claims the ALJ erred in posing an inadequate hypothetical to the vocational expert during her hearing. The issue of whether the hypothetical posed by the ALJ to the vocational expert is adequate and reflects the limitations in the ALJ's determination is analyzed at Step 5 of the disability analysis. Because the ALJ did not make a step 5 finding in this case as discussed above, Boyd's claim need not be addressed by this court.

CONCLUSION

      For the foregoing reasons, the Commissioner's decision is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this opinion.

Dated this 31st day of March, 2006.

Honorable Paul Papak
United States Magistrate Judge

Page 26 - OPINION AND ORDER OF REMAND